# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### WESTERN DIVISION

HYBRID KINETIC AUTOMOTIVE HOLDINGS, INC.
and AMERICAN COMPASS, INC.                                        PLAINTIFFS


VS.                                        CIVIL ACTION NO. 3:09-CV-35-M-A


HYBRID KINETIC AUTOMOTIVE CORP.,
CHARLES WANG, JACK DENG, GARY TANG,
and NICHOLE DENTON                                        DEFENDANTS


**\* \* \***


HYBRID KINETIC AUTOMOTIVE CORPORATION,
CHARLES WANG, JACK DENG, GARY TANG,
NICHOLE DENTON, BETHANY TURNER,
KONG BING OEI, PETER KREUTER AND
MOTOREN-und ENGINE-TECHNIC GmbH                    THIRD-PARTY PLAINTIFFS

VS.

YUNG (BENJAMIN) YEUNG A/K/A RONG YANG,
RHEA YEUNG, VINCENT WANG, JIMMY WANG,
QUAN LIU, ZHENGSHAN LI, ZHENGWEI ZHANG,
HONGYU SUN, HYBRID KINETIC AUTOMOTIVE
HOLDINGS, INC., HYBRID KINETIC MOTORS CORPORATION,
THE ALABAMA CENTER FOR FOREIGN INVESTMENT, LLC,
FAR EASTGOLDEN RESOURCES GROUP, LTD. AND
AMERICAN COMPASS INC.                            THIRD-PARTY DEFENDANTS


## ORDER

This cause comes before the court on its own motion, attempting to streamline and clarify

the issues in this case based upon the parties' submissions to date. This court's order today

merely sets forth its initial conclusions, which are all subject to change based upon subsequent

proof, arguments, and/or reconsideration by this court.  This order is intended as a starting point for possible resolution of this case, and the parties may address this court's initial findings in their subsequent submissions.

This court is not accustomed to issuing advisory rulings, and it would prefer that this order be responsive to a dispositive motion filed by either party.  It is apparent, however, that crucial depositions in this case will not be completed for weeks if not months, and a month-long period of renewed briefing and counter-briefing will no doubt follow the completion of such discovery.  Moreover, recent history has demonstrated that both sides to this litigation have a predilection for submitting revised summary judgment and/or preliminary injunction motions whenever they are able to score points in discovery.  Accordingly, it seems doubtful that this court would be able to rule upon a fully briefed summary judgment and/or preliminary injunction motion, incorporating all relevant discovery, before September at the earliest.  It seems clear, however, that there are important third party stakeholders in this case, most notably the State of Mississippi and Chinese investors, who are badly in need of information regarding the status of this litigation.  All parties have expressed their agreement to the lifting of the seal and gag orders in this case, and the door has thus been opened for this court to set forth its initial conclusions regarding this case.  It will endeavor to do so in this order.

This is an extraordinarily complex case involving a $6.5 billion project, proposed to be financed by Chinese investors, to build a hybrid car factory in Tunica Mississippi.  The parties have worked with Governor Barbour, the Mississippi Development Authority ("MDA") and Tunica County to lay the groundwork for the project.  The parties' submissions make reference to working prototypes of a planned hybrid car being in existence at Meta Motoren-und Engine-

Tecknik GmbH ("Meta"), a German engine company, and this court is informed by counsel that Tunica County has already obtained an option to purchase the land which is envisioned as the site for the hybrid car factory. According to defendants' version of the facts, the parties have proceeded in the hybrid car project primarily by means of a "handshake" deal whose terms are largely uncertain. This court is informed by counsel for defendants that this business practice is common in China, where considerations of "honor" and "face" are paramount, and where it can be considered rude to demand that the terms of a contract be put in writing. Unfortunately, this business practice tends to give rise to disputes which elude a quick or easy resolution in a United States courtroom. Plaintiffs, for their part, deny the existence of any such handshake agreement.

The most that this court can say with certainty about the hybrid car project is that 1) it involved an agreement by two men - Benjamin Yeung and Charles Wang - to work together in some capacity to pursue the project and 2) it has broken down in rather spectacular fashion. All parties seem to recognize that a central legal issue in this case is whether or not Wang was a joint venturer with Yeung in the project, or whether he was instead Yeung's employee. Yeung contends that Wang's role in this venture was as his employee, and, if this court is persuaded that such is the case, then the plaintiffs would more likely prevail in this lawsuit. Clearly, the mere fact that an employer has not proceeded as he represented he would in a project, or even the fact that the employee comes to suspect that the employer is dishonest, does not give the employee the right to essentially take over the employer's business for his own benefit. If, on the other hand, a joint venturer fails to live up to his responsibilities in that venture, then the law, informed partly by considerations of equity, might well allow the other joint venturer to pursue the project with other investors. The foregoing should make it clear that this court considers Yeung's status,

3

as either an employer or joint venturer, to be of considerable importance in this case.

Yeung was described on defendant HKAC's website, in happier times, as the company's "chairman and founder" who had previously served as the Chairman and CEO of Brilliance China Automotive Holdings Limited ("Brilliance"). The website entry, which has since been deleted, described Brilliance as the "first China-based company to acquire a public listing on the New York Stock Exchange in October, 1992," and the website asserted that Forbes magazine listed Yeung as being the "third wealthiest entrepreneur in China" in 2001. The website also asserted that Yeung was the Chairman and President of Shenyang Jinbei Passenger Vehicle Manufacture, Corp., and it stated that this company was transformed into a profitable car company under Yeung's leadership.

Defendants have submitted evidence suggesting a less reputable side to Yeung. In particular, defendants have produced a January 29, 2009 article from the South China Morning Post entitled "Fugitive Link as Bill Clinton Cashes in on date in HK." This article discusses a $300,000 donation made by plaintiff Hybrid Kinetic Automobile Holdings, Inc. ("HKAH") to former president Clinton, and it describes Yeung in less-than-flattering terms:

> Former US president Bill Clinton accepted $300,000 for a Hong Kong speaking engagement from a company run by a mainland fugitive. The company, Hybrid Kinetic Automotive Holdings, sponsored an event on December 4, three days after Mr. Clinton's wife, Hillary Rodham Clinton, was nominated as US Secretary of State. The Hybrid Kinetic Automotive website shows it is chaired by Benjamin Yeung, whose company resume matches that of Yang Rong, the former chairman of Brilliant China Automotive, who fled the mainland in 2002 after being charged with "economic crimes." A spokesman for Hybrid Kinetic Automotive last night confirmed that Yeung and Yang were the same person.

This newspaper article is the only objective information at this court's disposal regarding the

reputation and/or credibility of either Yeung or Wang, and it clearly does not portray Yeung in a positive light.

Yeung has done little to enhance his credibility with this court through his submissions in this case. Indeed, he did not see fit to include himself as a plaintiff in this lawsuit, even though he is clearly the driving force behind it. Defendants assert that Yeung, rather than the plaintiff corporations, is the real party in interest in this case, and they cite this as a basis for dismissing this lawsuit. This court is not prepared to go this far, given that the plaintiff corporations do appear to have colorable claims which they may assert in their corporate capacities. For example, plaintiff HKAH argues, based upon proof discussed below, that it was intended to be HKAC's sole shareholder and that it has been unlawfully "cut out" by defendants. Similarly, plaintiff American Compass, Inc. ("ACI") asserts, with supporting proof, that it has made payments in support of the hybrid car project and that it is being wrongfully deprived of the fruits of those payments by defendants. These facts do tend to support plaintiffs' right to seek relief in their corporate capacities, but this court agrees with defendants that Yeung's absence from this lawsuit is anomalous and raises questions regarding what has motivated that absence.

In addition to failing to include himself as a plaintiff, Yeung has also shown a reluctance to submit evidence in this lawsuit. While plaintiffs submitted voluminous documentation in support of their motion for preliminary injunctive relief, conspicuously absent was any affidavit or other declaration from Yeung himself. Moreover, when it initially appeared that this court would be holding an early evidentiary hearing on plaintiffs' motion for preliminary injunction, this court was informed by counsel that Yeung was "sick" and would be unable to attend. This court was forced to repeatedly request, first informally and later through a formal order, that

Yeung submit a declaration so that it might better understand plaintiffs' version of the facts of the case. Yeung finally complied with this order on May 8, 2009, the last day of the response period provided by this court. It thus appears that Mr. Yeung has been reluctant to submit his side of the story under oath. While Yeung initially earned some credibility with this court by submitting his affidavit, the veracity of his statement was later cast into very serious doubt by defendants' strongest evidence in this case, the affidavit of Kimble C. Cannon. The court will discuss this affidavit in detail below.

In addition to his reluctance to appear in this action, it seems clear that Yeung has a predilection for operating behind a bewildering maze of corporate entities of uncertain ownership and purpose, a practice which has made deciphering the particulars of this lawsuit extremely difficult for this court. A key argument raised by plaintiffs in their motion for preliminary injunction involved proof that HKAC, the planned operating arm of the hybrid car project, was intended to be a wholly-owned subsidary of plaintiff HKAH. The court interpreted this as an argument that Yeung owned HKAH and that, since HKAH was intended to own HKAC, Yeung was the rightful owner of HKAC and thus the hybrid car project itself. A closer inspection of the record revealed, however, that the owner of 100% of the shares of HKAH is actually Yeung's *wife*. The court does not assert that plaintiffs misled it in this regard: their submissions make reference to Yeung as being the "chairman" and sometimes "founder" of HKAH and ACI, but nowhere is it suggested that he is the "owner" of these corporations. Still, the fact that the ultimate owner of HKAC under plaintiffs' theory of the case appears to be Yeung's wife - who had no apparent role in any agreement between Yeung and Wang - does tend color Yeung's dealings in this case with a sense of dodginess.

Yeung appears to have responded in characteristic fashion to the dispute in this case: by creating a slew of new corporate entities, as part of an apparent bid to pursue a car project in Alabama, rather than Mississippi.  The record reveals that, in January 2009, Yeung incorporated an entity known as Hybrid Kinetic Motors Corporation ("HK Motors") in Alabama, Delaware and California, and the record includes a reference to a similar corporation in the Virgin Islands. On March 24, 2009, yet another Yeung company, Far East Golden Resources Group Limited ("Far East") issued a press release announcing that it had obtained a controlling interest in the Alabama Center for Foreign Investment, LLC ("AFCI"), which manages EB-5 investments in the state of Alabama.[1]   If the foregoing were not sufficiently confusing, the record also indicates that HKAH was formerly known as Logos Automotive Holdings, Inc., and plaintiff ACI is itself merely a subsidiary of non-party Compass Pacific Holdings, Ltd. ("Compass Pacific"), yet another corporation associated with Yeung.

ACI's status as a subsidiary of Compass Pacific is significant, inasmuch as plaintiffs' first evidentiary submission, in support of their assertion that Wang was their employee, is a document entitled "Employment Offer Letter," which was signed by Yeung on behalf of Compass Pacific.  The letter from Yeung offers Wang the position of Executive Vice President of Compass Pacific beginning August 5, 2007, at the annual salary of $1,170,000 Hong Kong dollars.  This letter, while enmeshed within the maze of corporations created by Yeung, still

---

[1]EB-5 investments constitute an important sidenote in this case, since they refer to the U.S. immigration law provision which permits wealthy foreign investors to obtain visas to do business in the United States.  This regulation is a sort of reverse voluntary servitude for the wealthy.  Obtaining these visas on behalf of Chinese investors appears to be central to the viability of any business venture in the United States which relies upon such foreign investors.

constitutes significant proof in this case, as it does tend to suggest that Wang was once an employee of the parent company of ACI, which is involved with the financing of the hybrid car project. Once again, however, Yeung is merely listed as the "chairman" of both Compass and ACI, and it is unclear to this court exactly what his role in the companies might be.

In addition to the Compass Pacific letter, plaintiffs also score points with their submission of an October 10, 2008 e-mail from HKAC board member and co-defendant Gary Tang to Wang, stating that "from company setup point, there are lots of details on the documents I think we need talk about with boss." Plaintiffs suggest convincingly that "boss" is a reference to Yeung, and they also note references in e-mails and other documents to HKAC being intended as a mere subsidiary of HKAH. For example, a printout from a since-removed portion of HKAC's website refers to HKAC as being "a manufacturing entity, which is a fully owned subsidiary of Hybrid Kinetic Automotive Holdings, Inc."

Perhaps most persuasively, plaintiffs have submitted draft bylaws of HKAC which were prepared by local Mississippi counsel and attached to an October 21, 2008 e-mail which he sent to Tang. The draft bylaws clearly state that "Hybrid Kinetic Automobile Holdings, Inc." is the sole shareholder of HKAC, a fact which may prove difficult for defendants to deal with in this case, if they wish to do business as HKAC. In his e-mail, the attorney (who is apparently Tunica County's attorney) noted that he was not a corporate lawyer, and he suggested that Tang obtain corporate counsel in making any revisions to the draft bylaws. Defendants have submitted the actual revisions which they made to the draft bylaws, and notably HKAC's sole shareholder is now listed as Capital Wealth Holdings Limited ("CWHL"), an entity controlled by Wang. Plaintiffs argue, with some force, that by simply deleting the name "Hybrid Kinetic Automobile

Holdings, Inc." from the HKAC bylaws and replacing it with the name "Capital Wealth Holdings Limited," defendants have committed a sort of extrajudicial corporate coup against HKAH. Indeed, Wang conceded in testimony in a hearing before Magistrate Judge Sanders that he had ordered that Tang issue the shares in the name of CWHL, although he insisted that he was merely doing so to hold the shares in trust and that he was motivated by Yeung's failure to comply with the terms of the alleged joint venture. Still, the evidence indicates that Wang accepted financing for the hybrid car project from HKAH even after he had issued HKAC's shares in the name of his own company, thus casting further doubt upon his actions in this case.

In light of the foregoing, there is considerable evidence in this case suggesting that Wang acted without legal justification in issuing the shares of HKAC in his own company's name. Defendants argue, however, that this evidence should be considered within the broader context of Yeung's promise to serve as the financier of the hybrid car project, a promise which defendants contend was broken. In his affidavit, Wang contrasts the actions which, he alleges, Yeung promised to take and his actual performance to date:

> Charles Wang, being under the pains and penalty of perjury under the laws of the United States of America, declares as follows:
>
> 1. I am an adult citizen of the People's Republic of China, currently residing at [redacted] and have personal knowledge of the facts set forth below. I am the Chief Executive Officer and President of Hybrid Kinetic Automotive Corporation, Inc. ("HKAC"), formed in the State of Mississippi. HKAC is part of a joint-venture that began in August, 2007 for the purpose of the developing, designing, and marketing hybrid automobiles in the United States (the "Venture").
>
> The original Venture was an agreement between Yung (Benjamin) Yeung and me. The Venture was created at my suggestion to Mr. Yeung. As part of the Venture, we initially determined that we would need $200,000,000.00 in start-up capital in addition to acquiring the technology to build hybrid cars. Benjamin Yeung promised to provide $200,000,000.00 in start-up capital. ... For our contributions in the original Venture, Benjamin Yeung was to receive 80% of the

stock issued by HKAC and I would receive 10% of the stock issued by HKAC. Another 10% of the stock would be allocated to senior management. In fact, Mr. Yeung registered a Hybrid Kinetic Automotive Holdings in British Virgin Island in which he was a 90% shareholder and I was a 10% shareholder. Last year, he registered a Delaware company with the same name and the same shareholding structure.

Wang describes his role in the hybrid car project as follows:

My responsibilities under the original joint-venture agreement included identifying and obtaining investors, locating and securing a site location for the Venture, interacting with state and national government in securing any available incentive packages, and otherwise managing the day-to-day operations of the Venture. I was neither an employee of Mr. Yeung nor his companies. I was given executive and board positions with companies controlled by Mr. Yeung and received nominal compensation. Therefore, I was not under the employment of Mr. Yeung or his companies. From the beginning to now, we have been partners in this Venture.

In his affidavit, Wang asserts that Yeung lied about owning the hybrid car technology at issue in this case and that he only produced a small portion of the financing which he had promised:

To date, Mr. Yeung has only contributed approximately $1,600,000.00. These costs was [sic] used to obtain office space, acquire legal and political consultants, purchase vehicles, and pay salaries and insurance for Nicole Denton and Bethany Tuner, employees hired by HKAC in Mississippi. The total costs contributed by Mr. Yeung to HKAC is less than 2% of his promised amount under the Venture. Mr. Yeung also represented to me that he already purchased the necessary technology to develop a hybrid car. I later found out that this was not true. To date, Mr. Yeung does not own or possess the technology necessary for the Venture.

Wang asserts in his affidavit that, in addition to Yeung's failure to provide the promised financing or technology, he became concerned about signs that Yeung was a pariah of sorts among Chinese law enforcement officers. In support of this assertion, Wang cites the aforementioned Chinese newspaper article, and he also describes ominous warnings which he

and other HKAC employees received from Chinese law enforcement agents:

> In December 2008, I received a phone call from an official working in the Chinese Ministry of Public Security (the "Ministry"), which is China's equivalent of the Federal Bureau of Investigation in the United States. I was informed by this official that there was still an arrest warrant against Mr. Yeung for suspected economic crimes in China. The Ministry official told me that the Ministry does not favor any fund raising activities in China if Mr. Yeung is managing HKAC. [HKAC employees] Mr. Xu and Mr. Lei later informed me that they also received similar warnings. This was a major problem to HKAC's efforts to secure funding through the EB-5 Pilot program because if the Chinese government would not approve it, we would not be able to secure that funding.

According to Wang, the warnings from Chinese law enforcement agents led him to conclude that the hybrid car project could not continue with Yeung as its public face. Wang contends that he instead offered Yeung the role of silent investor, a role which he rejected:

> On December 30, 2008, I traveled to Benjamin Yeung's home in California to discuss the warnings received from the Ministry in addition to HKAC's need for money. At our meeting, I informed Mr. Yeung that, although he could remain as an investor in HKAC, the company could not afford the political and financial risk associated Mr. Yeung's presence on the HKAC board of directors. I asked Mr. Yeung to remain a silent investor for the time being and that we had no objection to him being the Chairman of HKAC when the political and financial risks were gone. Mr. Yeung would not agree to a silent role in HKAC and threatened that he would "kill the project" if HKAC tried to proceed without him as Chairman of the board. At this meeting, I also requested Mr. Yeung to provide the financing he had promised. Mr. Yeung refused to respond to my request.

Defendants contend that the instant lawsuit merely reflects Yeung's attempts to keep his promise to kill the hybrid car project.

In considering Wang's affidavit, the court initially notes that he has earned credibility, relative to Yeung, by simply submitting his version of events under oath without prodding from the court. In a case which requires this court to interpret an alleged verbal agreement among the

parties, their credibility is crucial. While plaintiffs do have considerable documentary evidence in their favor, defendants argue that these documents are merely part of a broader deal whose terms were never put into writing. In considering the terms of this alleged deal, this court will be guided by the credibility of the parties and also by their actual actions taken in this case. Although the documentary evidence in this case favors plaintiffs, credibility issues and the "facts on the ground" do appear to favor the defendants.

While Yeung appears to have provided only a tiny fraction of the capital needed to make the hybrid car project a reality, the record reveals that defendants have done a very considerable degree of "legwork" in laying the foundation for the project. In reviewing the parties' submissions, this court was impressed by the degree of planning and preparation which has been made by defendants in attempting to make the hybrid car project a reality. For example, exhibit "P" to plaintiffs' initial motion for preliminary injunction is a lengthy document which appears to be a prospectus marketing the project to potential investors. The document is professional in appearance and content and reveals a high degree of planning and preparation on the part of defendants. The document includes a layout of the planned Mississippi car factory and specific plans for future production at the factory. Of course, plaintiffs will point out that funding for this initial legwork came largely from the (according to the parties' varying accounts) $1.6 to $2.5 million which they provided to defendants, but it is apparent that far greater amounts in start-up capital are required to make the hybrid car project a reality.

In his affidavit, Yeung denies that he ever agreed to provide anything approaching $100-200 million in start-up capital or that there was ever a joint venture of any kind between himself and Wang:

[T]he centerpiece of Mr. Wang's Declaration defending his conduct is that he and I entered into some kind of oral joint venture for the development of the hybrid car project. The entire history of Mr. Wang's involvement in the hybrid car project and his relationship to the companies that controlled and funded hybrid car project contradicts the existence of a joint venture between me and Mr. Wang.

According to Mr. Wang, the joint venture agreement required me to provide $200 million in financing for the hybrid car project, in exchange for 80% of the shares in HK Corporation. Mr. Wang, in turn, was to provide services such as identifying investors, locating a site for the venture, interacting with state and local officials to secure incentive packages and managing the day-to-day operations of the project. In return, Mr. Wang contends that I agreed that he was entitled to 10% of HK Corporation's shares. Mr. Wang then argues that I breached the joint venture agreement by failing to provide the financing, and thus he was justified in seizing control of the joint venture, and its hybrid car project. In fact, no such joint venture existed and Mr. Wang has fabricated this claim to justify his theft of HK Holdings' interest in HK Corporation and the hybrid car project.

In his affidavit, Yeung asserts that it would be nonsensical for a businessman to invest $100-200 million in start-up capital in a project of this nature:

I certainly never committed to personally fund the project with either $100 or $200 million. Indeed, I cannot imagine any experienced businessman who would invest such amounts of their own money into a start-up company, even one as promising as the hybrid car project. Rather, in my experience, financing is typically raised from a variety of sources including individual investors, financing institutions, investment banks, hedge funds and so forth. In this case, however, I formulated a plan to raise the financing necessary for the hybrid car project from immigrant investors pursuant to the EB-5 Investor Pilot Program and communicated that plan to Mr. Wang.

It is thus apparent that Yeung and Wang provide versions of the basic facts of this case which can not be reconciled with each other. It does strike this court, however, that, even under Yeung's version of events, he has contributed little of an objective nature to the hybrid car project, when one considers the overall requirements of the project. Indeed, Yeung admits that he has not contributed anything approaching the amount of funds that would be needed as start-up capital,

and it is clear from the record that defendants have done the majority of the actual legwork in making the hybrid car project a reality. Yeung asserts that the idea for the project was his, but this assertion is disputed by Wang. It thus appears to this court that the eventual owner of any hybrid car project will be the investors who will be required to finance it and that none of the parties to this lawsuit have contributed enough to the project to have a strong equitable claim to sole direction of it.

It is apparent that, if a jury were to find Wang's testimony that he had a planned 10% interest in the hybrid car project credible, then this would tend to support a conclusion that the project had at least some aspects of a joint venture, rather than a mere employment relationship. Clearly, a mere employee in a corporation is generally not granted a 10% interest in that corporation. Yeung flatly denies that Wang was ever envisioned as having a 10% interest in the hybrid car project, and it is thus significant that defendants have produced documentary evidence which appears to support Wang's version of events. The document is a graphical presentation which Yeung characterizes as "a Power Point slide prepared by a Hong Kong law firm" in December 2008.

In his affidavit, Yeung asserts as follows:

The graphic was created pursuant to a discussion of a potential equity interest for Mr. Wang in my British Virgin Islands holding company, HK Automotive Holdings, Ltd. (the "BVI Company"). According to the chart, the BVI Company would hold the shares of HK Holdings, the Delaware corporation, which in turn, would own HK Corporation. Even if this graphic represented the relationship between the parties, it shows that I would have owned 80% of the BVI Company and that HK Holdings still would have held 100% of the shares of HK Corporation. The graphic does not show that Mr. Wang would have had a direct equity interest in HK Holdings or HK Corporation.

The fact that Yeung concedes that there were discussions regarding Wang having a 10% equity interest in his Virgin Islands holding company is significant, since this tracks Wang's own version of the basic "handshake" deal between the parties. Moreover, an initial inspection of the document appears to reveal that the Virgin Islands corporation was envisioned as being at the top of a corporate "food chain," with plaintiff HKAH directly below it. Accordingly, Yeung's attempt to minimize the significance of this document is less than persuasive. Also unpersuasive is Yeung's suggestion that Wang lost any right to a 10% interest by failing to make a required $1.5 million payment. Yeung does not appear to be in a strong position to argue about Wang's failure to make required payments, given the nature of plaintiffs' allegations in this case. More directly, however, Yeung's reference to Wang's rights and obligations supports defendants' contention that there was a broader relationship between the two men which had some of the characteristics of a joint venture and which was not reflected in the terms of any employment agreement.

The Power Point exhibit, along with the previously discussed credibility factors, initially led this court to suspect that it was Wang, rather than Yeung, who was being truthful. It appeared, however, that there would be no true "smoking gun" evidence which definitively established the true facts in this regard. In what must be considered their strongest evidence in this case, however, defendants have recently submitted an affidavit from a seemingly credible and disinterested third party which suggests that Yeung's affidavit may contain a number of false statements regarding material aspects of this case.

The affidavit in question was made by Kimble C. Cannon, who is presently an attorney with the Los Angeles office of Gibson, Dunn & Crutcher, a nationwide law firm. Kimble notes

in his affidavit that, at the time of his dealings with Yeung and Wang, he was first a counsel to a

Commissioner of the Securities and Exchange Commission and later an investment banker with

Morgan Stanley & Company. In his affidavit, Kimble describes his dealings with Wang and

Yeung as follows:

> 3.      In the Spring of 2006, while employed as counsel to one of the
> Commissioners at the SEC, I was approached by Mr. Charles Wang. Mr. Wang
> was seeking an opportunity to raise investment capital for projects in the United
> States using a program offered by the United States government to bring foreign
> investors into the country. In response to Mr. Wang's request for assistance, a
> letter from the SEC Commissioner's office was sent to the governor of
> Guangdong Province in China inviting him to travel to the United States and meet
> with officials at the SEC. It was my understanding at the time that Mr. Wang had
> not identified a specific industry to target for his proposed investment program.

> 4.      In the early summer of 2007 I was again contacted by Mr. Wang. At this
> time I had left my position at the SEC and was working as an investment banker
> with Morgan Stanley & Company. Mr. Wang advised that he was continuing to
> evaluate business opportunities in which he could take advantage of a program
> offered by the United States government to bring foreign investors into the
> country. ...

> Following Mr. Wang's invitation to Morgan Stanley that it consider
> becoming a placement agent for the proposed private placement, Morgan Stanley
> initiated due diligence on the proposed business and its principles. During the
> course of our due diligence review, I had the opportunity to meet with Mr. Yung
> (Benjamin) Yeung, who was introduced to me as Rong Yang ("Yeung"). I met
> with Mr. Yeung at his home in California on multiple occasions. Several other
> people attended various parts of the meetings, including two officials with the
> Mississippi Development Authority. During the course of these meetings, both
> Mr. Yeung and Mr. Wang confirmed that they would each, either personally or
> through controlled companies, be equity owners in the project. I was told that the
> company raising the investment funds through the private placement would be
> incorporated in the British Virgin Islands. Mr. Yeung and Mr. Wang confirmed
> that Mr. Wang would initially hold a 10% equity interest in the venture and that
> Mr. Yeung would initially hold an 80% controlling interest, with the remainder
> held for the benefit of company officers and employees. I understood these equity
> interests would be diluted as new investors purchased equity stakes in the project
> through the proposed private placement.

7.      In one of my meetings at Mr. Yeung's home I had the opportunity to sit and speak with Mr. Yeung directly.  The only other person in attendance was an assistant to Mr. Yeung named Vincent Wang who acted as a language interpreter.  During the course of this conversation I asked Mr. Yeung about many aspects of the proposed business, including its financing, cost and ownership structure.  Mr. Yeung confirmed that he would be providing the initial capital required for the project and that Mr. Wang would be contributing his labor and expertise.  During the course of this conversation, and later discussions attended by other persons, the substantial upfront costs of designing four lines of automobiles and undertaking the required civil engineering work was discussed.  At no time was I told by any person, including either Mr. Yeung or Mr. Wang, that Mr. Wang was to contribute any money to the venture. Rather, I was told, in conversations attended by Mr. Yeung at which there was present a English to Chinese language interpreter, that Mr. Yeung would be providing funds sufficient to pay all of these substantial upfront costs, which I recall were projected to exceed $100 million.  I also do not recall being told that Mr. Wang was an employee of Mr. Yeung with respect to the venture.  Rather, it was presented to me by both Mr. Wang and Mr. Yeung that this was a joint venture between Mr. Wang and Mr. Yeung with Mr. Yeung the controlling shareholder.


8.      During the course of my meetings with Mr. Wang and Mr. Yeung I was advised that an amount totaling $10 billion was intended to be raised through several rounds of private placements to third party investors under the government's EB-5 visa program.  I was further advised that approximately $1 billion of the amount raised through private placements was intended to be used to acquire automobile dealership networks in the United States.


9.      Following Morgan Stanley's due diligence efforts on this project, later in 2008, I was contacted by Mr. Wang, who asked that Morgan Stanley send representatives to Mississippi to attend meetings relating to the proposed venture.  Morgan Stanley declined to send me or any other Morgan Stanley employee to these meetings for a variety of reasons.  To my knowledge, Morgan Stanley declined to send representatives to these meetings in part due to concern over legal disputes we had become aware of between Mr. Yeung and the Chinese government and also because we had not received evidence that the venture was sufficiently funded.

Mr. Cannon appears to be a highly credible witness, and his affidavit appears to strongly support

Wang's version of events and to squarely contradict several material aspects of Yeung's

affidavit.  In particular, Cannon's affidavit contradicts Yeung's denial of any broad venture with Wang, his denial that he had ever agreed to put up $100 million in capital, and his denial that Wang was ever contemplated as having an equity interest in the venture.  Cannon's affidavit also serves to buttress defendants' Power Point exhibit, since Cannon confirms that "the company raising the investment funds through the private placement would be incorporated in the British Virgin Islands."  In his affidavit, Yeung denied both that the Power Point exhibit represented the correct corporate structure of the hybrid car project and that Wang was envisioned as having an equity interest in that project.   These denials by Yeung, which involve facts at the heart of this case, now appear highly suspect.

Assuming that this court were to conclude that Yeung had knowingly misled it in his sole sworn submission to date, the question arises as to the impact which this would have on this litigation.  This court requests that the parties brief the issue of this court's discretion to limit or deny plaintiffs recovery in the event that it concludes that Yeung did, in fact, make knowing falsehoods in this regard.  As noted previously, this court is not inclined to deny plaintiffs recovery based solely upon the fact that they are corporations closely associated with a party who is absent from this lawsuit.  At the same time, the question arises as to what extent this court should permit these corporations to seek recovery on behalf of an individual who has strenuously avoided personal involvement in this lawsuit, except with regards to the submission of an affidavit which appears to be replete with falsehoods.  At this point, there is every reason to doubt that Yeung will even appear at trial, given his prior conduct and the impeachment evidence which awaits his cross-examination.  The fact that Yeung nevertheless seeks large monetary damages from a court whose processes he has treated with light regard concerns this court.

The equities of this case are complicated by the fact that, while Wang appears to have been quite honest with this court, he has admitted to engaging in conduct of dubious legality. In particular, Wang's admitted actions in issuing HKAC shares in his own company's name, while still continuing to accept funding for the hybrid car project from HKAH, is something this court can not condone, however lacking Yeung's credibility may be. In light of Cannon's affidavit, there is considerable evidence of some sort of broad venture between Wang and Yeung, and this court finds Wang's assertion that he acted out of a genuine belief that this venture had been breached by Yeung to be credible. Indeed, Wang's background suggests that he would have been aware of the legal consequences of engaging in the sort of blatant corporate coup which plaintiffs contend he committed in this case. Prior to being removed, the HKAC website described Wang as a graduate of Duke Law School who had formerly served as a "capital market partner and the head of Asia practice for a prominent New York law firm" and who had, prior to that, held a similar position with a "prestigious Washington law firm." While prominence and prestige are laudable attributes in today's society, the older virtues of common honesty and integrity sometimes still carry the day.

Clearly, experienced attorneys can and do commit tortious acts, just like non-attorneys. Still, Wang's background and obvious knowledge of the law tend to support a conclusion that he subjectively believed that he was acting as a joint venturer who had a right to pursue the hybrid car project on his own behalf, after Yeung allegedly failed to meet his obligations under the venture. Even assuming Wang's best intentions, however, this court has serious concerns regarding the manner in which defendants chose to carry out their decision to operate HKAC without Yeung. This is a nation of laws. It would have been far preferable for defendants to

have sought a court order authorizing them to operate HKAC on their own behalf, rather than simply taking unilateral action in this regard. While the court can not rule out entirely the possibility that defendants will be permitted to continue to operate as HKAC, they may face an uphill battle in convincing the court to allow them to do so. This does not necessarily mean, however, that defendants will be unable to compete for a hybrid car project in some other corporate capacity.

It strikes this court that, when presented with a case where both parties have behaved poorly with regard to a project of great potential public benefit, the strongest equities lie not with either party, but with the public. Under these circumstances, perhaps the most equitable resolution of this case would be one which awarded a limited amount of reliance damages to place the parties in the position they were in before this controversy, while still permitting free and open competition for any hybrid car project. The court notes that all parties agree that neither Yeung nor Wang owns the actual hybrid car technology which will be used in any project, and this fact may assist in permitting a resolution along these lines. In describing the contractors to be used in building the hybrid car prototypes, Yeung asserts as follows:

> Lion GmbH had been retained to act as the master contractor on the project. Thus, Lion GmbH had the responsibility to identify other contractors to work on the project. Each contractor was to be responsible for building a different component of the vehicle. The components would all be integrated in the final prototype.
>
> In order to facilitate the agreements with contractors, Lion GmbH set up meetings at its office in Aachen, Germany, where the proposed contractors were interviewed and a Memorandum of Understanding ("MOU") was negotiated with each contractor. Lion GmbH was also responsible for interfacing with the various subcontractors as the work proceeded. As HK Corporation still had no revenues or working capital, HK Holdings paid Lion GmbH €1.2 million for its services

and for the services of the other contractors. . . .  Third party plaintiff Kong Bing Oei is the principal of Lion GmbH.

There were approximately nineteen subcontractors who entered into MOU's relating to the hybrid car project.  Meta Motoren-und Engine-Tecknik GmbH ("Meta") was one of the contractors brought into the project by Lion GmbH.  Meta was the contractor which would be responsible for the engine and for integrating the components provided by other subcontractors.  Pursuant to the MOU, Meta was to receive a fee for its services.  Meta owned the engine technology and related patents.  Meta does not own the technology or patents for other components of the prototype.

Yeung thus acknowledges that Meta owns the engine technology and patents, and the record indicates that this company has two hybrid car prototypes in its possession.  Yeung's affidavit does not indicate which companies own the technology for the remaining parts of the planned vehicle, but it does not appear that ownership of these patents lies with either Yeung or Wang.

Obviously, any hybrid car project will require an actual hybrid car to produce, and the parties clearly recognize the importance of securing the hybrid car technology.  In his affidavit, Wang asserts that Yeung has engaged in a form of corporate deception to secure Meta's technology for his own benefit:

I have received multiple telephone calls from executives at Meta Motoren-und Engine-Tecknik GmbH ("Meta"), a German engine company that has manufactured two hybrid prototypes cars for HKAC, stating that Mr. Yeung has tried to obtain HKAC's prototype car currently located in Germany.  Meta and Kong Bing Oei, through his corporation LION GmbH, have developed the main asset of HKAC: the prototype vehicle (the "Prototype").  (*See* Exhibit 7, *Letter from Meta to Governor Barbour dated March 23, 2009*).  Mr. Yeung has tried on multiple occasions to misrepresent that he is in charge of HKAC in an effort to steal the Prototype.  Mr. Oei, Mr. Kreuter and their corporations have invested millions of dollars into this project and stand to lose billions if this Mr. Yeung is successful in killing the HKAC project.

Mr. Kreuter also informed me that someone on behalf of Mr. Yeung contacted Meta and represented that HKAC's internet server was down and that HKAC lost copies of all its contracts.  Therefore, Mr. Yeung asked that we re-execute the contract between Meta and HKAC.  The contract provided, however,

was not with HKAC.  The proposed contract was for Mr. Yeung's competing
project on behalf of HK Holdings.  (*See* Exhibit 8, *Cover Page from Proposed
Fraudulent contract*).  This fraudulent contract was created to look almost
identical to the original contract executed with HKAC.  (*See* Exhibit 9, *Cover
Page from Actual Contract Between Meta and HKAC*).  This contract is clear
evidence that Mr. Yeung was working against and maliciously trying to defraud
HKAC.

Defendants have attached the cover sheet for the allegedly fraudulent contract, and it appears to

support their contention that Yeung attempted to pull a "bait and switch" maneuver to secure

Meta's technology under false pretenses.  While it can be argued that Yeung was simply trying to

obtain technology to which he had some arguable claim, the deceptive manner in which he acted

raises further doubts regarding his credibility.  Significantly, Yeung does not attempt to rebut

plaintiffs' description of his actions towards Meta in his lengthy and otherwise comprehensive

affidavit.

Apparently angered by Yeung's attempt to obtain his technology, Meta's principal Peter

Kreuter, along with Lion's principal Kong Bing Oei, have joined with defendants as third party

plaintiffs against Yeung.  The fact that technology providers who have dealt with both parties

appear to prefer working with defendants and are actively suing Yeung casts further doubt upon

Yeung's credibility and upon his suitability to serve as the chairman and public face of any

hybrid car project.  In his affidavit, Yeung never attempts to rebut the Chinese newspaper

article's characterization of him as a "fugitive" accused of "economic crimes," nor does he deny

that Chinese law enforcement agencies have been actively opposing any hybrid car project with

him as its chairman.  The foregoing would appear sufficient to cast serious doubt upon the

viability of any Yeung-led hybrid car project, particularly one relying overwhelmingly upon

Chinese investors. When one considers also the fact that Yeung does not own the rights to the hybrid car technology and that the owners of that technology are presently suing him in this litigation, then the prospect of him actually serving as the founder and public face of a working hybrid car company begins to appear even more questionable. The court therefore has serious concerns that granting Yeung sole authority to pursue the hybrid car project would be tantamount to ensuring that the project never comes to fruition and that the enormous public benefits of the project will never be realized.

It is at this point in the dispute that this court must wonder out loud why it should not simply rescind all parties' contracts with Meta and the other technology providers and let those companies decide for themselves whether they should do business with plaintiffs, defendants, or neither. Unlike the parties to this lawsuit, none of whom have particularly clean hands, the technology providers such as Meta appear to be innocent victims in this dispute. It is arguable that the initial contract between HKAC and Meta was entered into without full disclosure of relevant facts, since HKAC's website and marketing materials originally characterized that company as a wholly owned subsidiary of HKAH and touted Yeung's status as chairman. The HKAC website obviously made no mention of the fact that the basic ownership of the hybrid car project was the subject of heated dispute and imminent litigation. Moreover, the evidence cited above suggests that Yeung made a particularly blatant play for Meta's technology under false pretenses, which casts serious doubt upon whether he has a rightful claim to the technology under considerations of either law or equity.

Under these circumstances, this court might well conclude that neither side to this litigation has an enforceable legal right to Meta's technology. Granting Meta (and other

technology providers such as Lion) the right to decide for themselves with whom they wish to do business is one attractive option to this court, partly because it would encourage a market-based solution to this dispute. The hybrid car project will only become a reality if it finds favor with both technology providers and investors, and securing the former is clearly essential to securing the latter. This court has the ability, subject to the Fifth Circuit's approval, to clarify the legal issues in this case, but it has no power to force the marketplace to invest in the hybrid car project. The court is therefore inclined to adopt a legal resolution which works with, and not against, the prevailing headwinds of the marketplace. Such a resolution would likely give both sides to this litigation an opportunity to pursue a hybrid car factory in the United States, although not necessarily with HKAC as the principal corporation behind the project.

The court would note with some regret that, on May 1, 2009, defendants filed a verified third party complaint which appears to reduce any hope that this litigation might be resolved in an expeditious manner. Many of the claims asserted in the third party complaint appear to be a "stretch," with several of them seeking recovery for the same conduct. To be specific, the third party complaint asserts the following claims:

> 1. Civil conspiracy 2. Abuse of process 3. Breach of joint venture and partnership agreement 4. Abandonment of joint venture 5. Breach of fiduciary duty 6. Breach of duty of good faith and fair dealing. 7. Tortious interference with business relations 8. Tortious interference with contract 9. Fraud 10. Fraud in the inducement 11. Trademark infringement 12. Unfair competition 13. Intentional and negligent infliction of emotional distress 14. Declaratory judgment 15. Spoilation of evidence. 16. Punitive damages

Even more questionable than the number of third-party claims asserted by defendants is their decision to bring into this lawsuit a host of third-party defendants of Chinese and other

nationalities, many of whom will, no doubt, have unique and compelling jurisdictional arguments to make to this court.

Some of the third party plaintiffs and defendants appear to be legitimate additions to this lawsuit. As noted previously, the third party complaint includes as plaintiffs Kreuter and Oei of Meta and Lion, respectively. This court has previously noted the importance of the technology owners in this case, and the addition of Kreuter and Oei accordingly strikes this court as being a positive development. Moreover, the third party complaint adds Yeung as a third party defendant, which may assist in the resolution of this case. It is unclear to this court, however, why the defendants saw fit to bring into this already complex lawsuit a host of Yeung employees in China such as Quan Liu, Zhengshan Li, Zhengwei Zhang and Hongyu Sun, as well as Jimmy Wang and Vincent Wang (no apparent relation to defendant Charles Wang), who appear to work for Yeung in California.

The third party complaint alleges that these third party defendants committed various nefarious deeds at the direction of Yeung, as follows:

> Mr. Yeung and Third-Party Defendants, through Hongyu Sun, have misrepresented that they were sent by Charles Wang and HKAC to inspect the prototype car in Germany, which was held by GIF GmbH, the prototype holder and custodian for HKAC.

> Mr. Yeung's deputy in China Mr. Zhengshan Li has falsely told Mr. Xu and other investors that the Mississippi state government has "ordered" HKAC to stop this project in Mississippi and also "ordered" the regional center not to work with HKAC on this project.

> Upon information and belief, Vincent Wang deleted emails to an account created for Charles Wang, Gary Tang and Jack Deng at the direction of Mr. Yeung.

Yeung, Quan Liu, Vincent Wang and Jimmy Wang have purposely, deliberately, and tortiously interfered with HKAC business partners, shareholders, and potential investors.

Jimmy Wang has made numerous harassing and threatening phone calls to Nichole Denton. In March, 2009, Jimmy Wang attempted to withdraw all money in a bank account that was previously contributed by Mr. Yeung to the Venture.

In the court's view, the joinder of these employees of Yeung appears likely to result in nothing but delay and expense on the path to their almost certain dismissal on jurisdictional or substantive grounds.

To be personally liable under Mississippi law, an agent must have some direct, personal participation in the tort, such as being the "guiding spirit" behind the wrongful conduct or the "central figure in the challenged corporate activity." *See, e.g. Smith v. Canadian National/Illinois Cent. R.R.*, 2007 WL 922308 (N.D. Miss. 2007); *Wright v. American General Life and Accident Ins. Co.*, 2002 WL 32360635 (S.D. Miss. 2002). Based upon the complaint, it seems clear that Yeung's agents were acting on his orders, and it seems very doubtful that they would face personal liability in this case. In addition, there are obvious personal jurisdiction issues arising from the joinder of these third party defendants, and this court will be disinclined to settle any doubts in this regard in a manner favorable to defendants.

In the court's view, defendants should seriously consider filing an amended third party complaint setting forth the essentials of their claims in a manner consistent with considerations of judicial economy and with sympathy for the task that any jury will face in deciphering the facts of this case and the various claims asserted therein. It has taken weeks of diligently reviewing the record in this case for this court to begin to feel comfortable with these matters, and it sees no realistic possibility that a jury will be able to coherently address the issues in this

26

case if they are presented with a form of the verdict involving over a dozen parties and several dozen claims, counter-claims and third-party claims. The third party complaint may arguably be seen as a "warning shot" by defendants across the bow of anyone thinking of working for or investing with Yeung, but sending such messages is clearly not the purpose of this litigation.

At this juncture, this court is inclined to move on an expedited schedule to a trial this fall, following which most of the issues in this case will likely be resolved by this court at the directed verdict stage, with any remaining issues submitted to a jury. Any damages claims which this court allows to be considered by the jury will likely be limited in scope. In the court's view, it is quite doubtful that either party will be able to establish full expectation-type damages in a venture as speculative as this one, particularly since the project broke down before a significant number of investors had signed on to it. In addition, defendants have conceded that plaintiffs are entitled to a return of much, if not all, of the $1.6 million that they invested in the hybrid car project, and this may well render the issue of reliance damages largely moot by the time of trial. Moreover, as noted previously, the fact that Yeung appears to have repeatedly made false statements in his affidavit raises doubts regarding the plaintiff corporations' right to essentially recover on his behalf. The court will consider any arguments and legal authorities on this issue at a later date.

This court is tentatively inclined to rule that plaintiffs have a right to proceed under the Hybrid Kinetic brand, since the evidence does suggest that HKAH was envisioned as the owner of HKAC and since defendants arguably used improper methods to take control of the corporation themselves. Moreover, while it is certainly curious that Yeung's wife is the ultimate owner of HKAH, she is obviously more closely associated with Yeung than with defendants. It

is not clear, however, that a right to operate under the Hybrid Kinetic brand will entitle plaintiffs to make the hybrid car project a reality, particularly since the technology owners Meta and Lion are presently aligned with defendants in this litigation.  This alignment may merely reflect the fact that these companies have executed contracts with HKAC, and this court is, as previously noted, inclined to rescind those contracts if it determines that defendants were improperly acting on behalf of HKAC.  This is an approach which, as noted previously, strikes this court as being consistent with considerations of fairness and with business realities.

Resolving this case in a manner consistent with business realities is important to this court, since it does appear that the framework for an actual car factory employing tens of thousands of workers may be in place. The court would hope that the parties to this case could resolve their differences in such a manner as to allow open and fair competition for the car project, which competition may involve the parties to this litigation or perhaps even third parties. It appears to this court that the role played by Yeung and/or Wang as a conduit between German technology owners, Chinese investors and Mississippi workers could validly be played by some third party if neither of them proves equal to the task.  Such a third party is unlikely to emerge, however, if the rights to the hybrid car technology are tied up in litigation for the next several years.

The foregoing considerations should make it clear why this court intends to move this litigation along as quickly as practicable under the circumstances and why it will have little patience with motions which appear designed to create delay and/or to inconvenience the opposing side.  This court intends to give all parties their day in court, but it intends to do so in a manner which reflects the fact that this is not a dispute affecting only the parties to this lawsuit.

The Fifth Circuit will eventually determine whether this court acted properly in adopting this approach, but, until instructed otherwise, this court will proceed under the general approach stated herein. Litigation may sometimes be tasked with broader responsibilities than simply declaring a winner.  Sometimes, considerations of law and economic realities compel the court to propose a road map to resolution.  At the same time, this court would hasten to add that, with regard to any specific rulings in this case, the inclinations expressed in this order are merely that- inclinations.

SO ORDERED, this 23rd day of June, 2009.


**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**